*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF DONALD J. ELLS.

ANDREA ELLS,

        Plaintiff-Appellant,

v

VICTORIA FIESE and DEANNA ENOS,
Copersonal Representatives of the ESTATE OF
DONALD J. ELLS, and Cotrustees of the DONALD
J. ELLS REVOCABLE LIVING TRUST,

        Defendants-Appellees.

UNPUBLISHED
September 26, 2025
12:06 PM

No. 370867
Clinton Probate Court
LC No. 23-032058-DE

Before: WALLACE, P.J., and RIORDAN and REDFORD, JJ.

PER CURIAM.

Plaintiff Andrea Ells appeals as of right the trial court's order denying her the rights of a surviving spouse under MCL 700.2801(2)(e)(*i*) (willfully absent from the decedent spouse for one year before spouse's death) of the Estates and Protected Individuals Code, MCL 700.1101 *et seq*. On appeal, Andrea argues that the trial court erred by relying on inadmissible hearsay and by incorrectly applying *In re Estate of Von Greiff*, 509 Mich 292; 984 NW2d 34 (2022), in which our Supreme Court interpreted that statutory provision. We disagree and affirm.

## I. FACTS

Donald J. Ells, Andrea's husband, passed away on December 22, 2023. On December 27, 2023, his daughter, Deanna Enos, submitted his pour-over will to the trial court, i.e., the probate court, for informal probate. The will was signed by Donald on February 16, 2022, and it essentially provided that his property would be given to the Donald J. Ells Revocable Living Trust, with three beneficiaries of that trust: Deanna Enos, Tanya Ells, and Victoria Feise, his daughters. In addition, the will specifically disinherited his wife, Andrea, and his daughter, Christina Cross:

-1-

> I intentionally make no provision for gifts to any child or children of mine, or to any other heir, other than those set out in this will. For reasons best known to me, I intentionally make no provision for gifts to **ANDREA L. ELLS** or **CHRISTINA CROSS**. **ANDREA L. ELLS** is my spouse; however, we have been separated for many years and have agreed to make no claims on the estate of the other. **CHRISTINA CROSS** is a biological child of mine and I do not want her to have any claim as a child in my estate. [Emphasis in original.]

The same day, the trial court appointed Deanna and Victoria as representatives of the estate.

On February 8, 2024, Deanna and Victoria petitioned the trial court to disallow Andrea the rights of a surviving spouse under MCL 700.2801(2)(e)(*i*), which provides that a "surviving spouse" does not include an individual who was "willfully absent from the decedent spouse" for a period of "1 year or more before the death of the deceased person."[1] The petition alleged, in relevant part:

> ¶ 11. Andrea Ells has been willfully absent from the decedent spouse ever since she left the decedent spouse in 2020.
>
> ¶ 12. Andrea Ells deserted the decedent spouse and purchased a home in Flint, Michigan in 2021, establishing her own separate residence in Genesee County, Michigan. . . .
>
> ¶ 13. Andrea Ells did not financially contribute to the decedent nor did she provide any support for the decedent spouse after she left in 2020. . . .
>
> * * *
>
> ¶ 19. The decedent [in 2022] filed for divorce from Andrea Ells more than two years after she left the decedent in 2020.
>
> ¶ 20. The decedent died 1 month before a hearing and judgement of divorce could be granted.

Andrea countered with her own petition seeking to obtain the rights of a surviving spouse, alleging, in relevant part:

---

[1] MCL 700.2202(2) of EPIC essentially provides that a surviving spouse may elect to receive a particular inheritance notwithstanding the terms of the decedent spouse's will.

¶ 9. That the Decedent was an abusive husband, and that the Petitioner was subject to abusive relationship perpetrated by the deceased. The police were called to the parties' home on multiple occasions throughout the course of the marriage.[2]

¶ 10. That the Parties had separated briefly in 2020. However, they reconciled and in the spring of 2021 the Decedent told his spouse that he was filing for divorce and that she needed to move from the home.

¶ 11. That the Petitioner purchased a condo and moved out in late April of 2021 contemplating that the Decedent would file for divorce as promised. . . .

¶ 12. That the parties continued contact even after the separation and had an ongoing relationship even though the parties were separated. The parties had ongoing talks about the separation of marital property and even about reconciliation.

* * *

¶ 14. That the Petitioner lived alone and never had another party living in her home, although both parties did date other people after the divorce was filed.

At the hearing on the competing petitions, Deanna testified that in January 2018, Andrea informed Deanna and Victoria that she filed for divorce from Donald and that there was no chance of reconciling. She said sometime shortly thereafter, Donald received an inheritance from the death of his mother, which he used to purchase a "Newaygo property up north," a boat, and apparently to help finance an RV. She continued that Donald and Andrea reconciled after the 2018 divorce filing.

In April 2020, Andrea left the home that she shared with Donald, and she returned in late 2020. Andrea returned to the home "because she needed a place where she can have internet, she needed a place for her and her son to live because she had no place to live." In April 2021, Donald told Deanna that Andrea had bought a condominium unit and consequently moved out of his home. Andrea never returned to Donald's home after that point.

When defendants' counsel asked Deanna whether she was "aware of any money that [Andrea] may have used or taken," Andrea's attorney objected on the basis of hearsay, but the trial court allowed Deanna to answer the question because her testimony was admissible to show Donald's "then existing state of mind," as well as "the declarant is unavailable under A4 due to death." Deanna then testified that in June 2021, Donald told her that "he's broke and that Andrea took his money and he basically paid for . . . her condo." Donald explained that he suspected that Andrea removed his money from his sole bank account because she was regularly in possession

---

[2] Deanna and Victoria largely denied this allegation, stating that "the police had been called to their home in 2007 and 2009" because "the couple had a dysfunctional marriage and they were both abusive to each other."

of his driver's license and his "bank cards." At about this time, Deanna had to help Donald pay his bills because his income was insufficient to do so.

On February 16, 2022, Donald called Andrea, in Deanna's presence, and informed Andrea via speaker phone that he had completed his will earlier that day. Andrea responded that "she didn't want anything, she was worried about the trailer" because it was not yet paid in full.[3] Andrea wanted to ensure that she would not personally be responsible for the trailer payments, i.e., "as long as it's paid off and out of her name." Ultimately, Donald filed for divorce from Andrea in August 2022, notwithstanding that he received the paperwork for the divorce in about March 2022.[4]

Melissa Patrick, who represented Donald in his August 2022 divorce case, testified that Donald told her that Andrea "initially left the home" in April 2020, and Andrea purchased a condominium unit in April 2021. Patrick explained that there were various procedural delays in the divorce proceedings, but that trial was ultimately scheduled for January 2024. That trial never occurred because Donald died the month before.

Victoria testified, over a hearsay objection, that Donald was "frustrated" during the divorce proceedings to learn that Andrea was pursuing the Newaygo property and other assets such as the pontoon because Donald acquired those assets through his inheritance from his mother, and he did not believe that Andrea would actually decide to pursue those assets.

Rocky Reynolds testified that he was Donald's friend. Over Andrea's hearsay objection, Reynolds testified that Donald said that "he paid all the bills, all the bills came from his account." However, Reynolds was not clear about when Donald made this statement, or to what timeframe the statement referred.

Andrea testified that she married Donald in 2007 and that they generally lived together "[m]inus the move out periods." Andrea said that she was unaware that Donald was dying of cancer in late 2023, although she was aware that he was in the hospital. She denied having access to his bank account or using his assets to fund her condominium purchase in 2021. She said that Donald helped her move out of his home into the condominium unit in April 2021. According to Andrea, Donald "kicked [her] out" in April 2020 but, essentially, the "official breakup" occurred in April 2021. Andrea's expectation during the divorce proceedings was that she would "get half of what I put into for the last 16 years of my life," and she was surprised to learn that Donald had "put everything that we earned together into a trust and give it to his kids that had nothing to do with us for the last 16 years." Andrea added that shortly after February 2022, i.e., when the parties were anticipating divorce but no such papers had yet been filed, "we had continual divorce talks,

---

[3] Apparently, the "trailer" and the "RV" are the same item.

[4] Deanna testified that on or about December 12, 2023, she attended a mediation hearing on Donald's behalf in the divorce proceedings, as he could not personally attend because he was in the hospital. Deanna overheard Andrea tell her attorney, "well, if he dies I'll just get it all anyways."

we had continual negotiations, we were continually -- we even at one point thought let's get back together." Finally, Andrea testified that she paid Donald's household bills, at least in part, in 2020, and that she spent at least a few months of 2020 working remotely at the Newaygo property. Andrea stopped assisting with those bills in April 2021.[5]

Two days later, the trial court issued its opinion from the bench, concluding that Andrea was not a "surviving spouse" pursuant to MCL 700.2801(2)(e)(*i*). The trial court reasoned that Andrea left Donald's home in April 2021 on her own accord:

> Later in 2020 she returned to the home in St. Johns. Ms. Ells said she was asked to leave the marital home. She said her intent was to get a place of her own so that she could not be told to leave. But she stayed in the St. Johns home until she intentionally and willfully chose to leave in 2021.
>
> In April of 2021 she did the absenting. She purchased a condo in Flint in her name alone. The mortgage was in her name alone. She removed all of her personal items from St. Johns into her condo. At that point she stopped contributing to any debts and assets accumulated during the marriage including joint debts such as a travel trailer and paid only her own bills. In February of 2022 testimony from both one of the daughters and Ms. Ells indicated that Ms. Ells was informed by a phone call from Mr. Ells that he made a will and trust. The daughter said Ms. Ells stated at the time she didn't want anything from him. Ms. Ells said she was told he made provisions for her; however, the daughter's testimony is consistent with the statement in the decedent's will that the parties indicated that they would make no claims against each other. Ms. Ells never followed up directly or indirectly about any provisions that were allegedly made or any matters after Mr. Ells call to her.

The trial court continued:

> In looking at the totality of circumstances from April 2021 to August 2022 for those 17 months Ms. Ells absented herself from Donald Ells and exhibited inattentiveness. There were no direct or indirect communications between the spouses and unlike the other separations she never returned. The only alleged communications were in February of 2022 when the decedent made a phone call to Ms. Ells to inform her he had procured an estate plan and she made no follow up contact after that. Allegedly in April 2022 joint tax returns were filed but there is no evidence that Ms. Ells signed those returns nor made any claim to what would be joint property of those returns of more that [sic] $4,000. For that period of time she stopped all financial contributions and assistance for any bills, debts, or assets remaining with Mr. Ells including any incumbrances for which she was also -- also legally obligated. She stopped use of all the Newaygo property. She never sought

---

[5] Andrea briefly stated that she "started seeing somebody in December of '23," but no other details were provided.

use or possession of any other jointly titled property such as the truck or travel trailer.

On August 26, 2022 decedent not the spouse filed for divorce. Any communication from Ms. Ells was forced due to the decedent's filing. From August 2022 to December 2023 unlike VonGreiff divorce communications yielded no agreements, concessions, or resolutions about the use or award of alleged marital -- marital assets or debts. In fact, decedent's divorce attorney testified she tried to negotiate with Ms. Ells toward payment of marital bills that existed after Ms. Ells left in April 2021 but Ms. Ells refused to make any contributions.

\* \* \*

Ms. Ells was willfully absent for more than a year before Mr. Ells passing. But for Donald Ells filing for divorce there is no evidence that she would have engaged in any behavior consistent with the existence of a legal marriage. She had cut off all financial dealings, she stopped paying on any joint debts, she had her own residence, she filed her own taxes, she abandoned all property and assets accessible to her prior to her purchasing her condo and began a romantic relationship with another man.

It seems contrary both to the intent of the statute and to the equity for the decedent that after minimally 17 months of complete estrangement that he cannot rid himself of a spouse who is no longer part of his life and has moved on in every physical, financial, and emotional way and that he has to keep his life in limbo at the risk of affirming the absent spouse's right to elect her share against his estate. Therefore I'm making a finding that the presumption has been rebutted and that Ms. Ells was willfully absent and cannot elect any spousal shares against Donald Ells estate. . . .

The trial court entered its written order one week later, memorializing its opinion from the bench and providing that the trust and estate "will continue to be Supervised until further Order from this Court."

This appeal followed.

## II. STANDARD OF REVIEW

"Issues of statutory interpretation are reviewed de novo." *City of Riverview v Sibley Limestone*, 270 Mich App 627, 630; 716 NW2d 615 (2006). "This Court reviews for an abuse of discretion a probate court's dispositional rulings and reviews for clear error the factual findings underlying a probate court's decision." *In re Portus*, 325 Mich App 374, 381; 926 NW2d 33 (2018) (quotation marks and citation omitted). "An abuse of discretion occurs when the probate court chooses an outcome outside the range of reasonable and principled outcomes." *Id*. (quotation marks and citation omitted). "A probate court's finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. (quotation marks and citation omitted). Finally, "a trial

-6-

court's decision to admit evidence is reviewed for an abuse of discretion." *Becker-Witt v Bd of Examiners of Social Workers*, 256 Mich App 359, 365; 663 NW2d 514 (2003).

## III. DISCUSSION

On appeal, Andrea argues that the trial court clearly erred by finding that she was "willfully absent" for the purposes of MCL 700.2801(2)(e)(*i*), given that the trial court relied on inadmissible hearsay and misapplied the framework for interpreting that statutory provision in *Von Greiff*. We disagree.[6]

## A. BACKGROUND LAW

Generally, "a surviving spouse may elect against the will of [his or her] deceased spouse[.]" *In re Harris Estate*, 151 Mich App 780, 783; 391 NW2d 487 (1986). See MCL 700.2202(2). However, MCL 700.2801(2)(e)(*i*) provides as follows:

> For purposes of [MCL 700.2101 *et seq*. to MCL 700.2401 *et seq*.] and of [MCL 700.3203], a surviving spouse does not include any of the following:
>
> * * *
>
> (e) An individual who did any of the following for 1 year or more before the death of the deceased person:
>
> (*i*) Was willfully absent from the decedent spouse.

"[T]he phrase 'willfully absent,' as used in MCL 700.2801(2)(e)(*i*), requires that the surviving spouse act with the intent to be away from his or her spouse for a continuous period of one year immediately preceding the death." *In re Erwin Estate*, 503 Mich 1, 11; 921 NW2d 308 (2018). "[T]he term 'willfully absent' cannot be defined exclusively by physical separation. Simply put, there must be something more than a mere physical distance." *Id*. at 16. "[W]illful absence requires consideration of the totality of the circumstances. It presents a factual question for the trial court to answer: whether a spouse's complete absence brought about a practical end to the marriage." *Id*. at 17. That is, "[a]bsence in this context presents a factual inquiry based on the

---

[6] As a separate issue, Andrea briefly argues that the trial court erred by finding that she was excluded as a surviving spouse under MCL 700.2801(2)(d), which provides that "a surviving spouse does not include . . . [a]n individual who, at the time of the decedent's death, is living in a bigamous relationship with another individual." This argument, however, misconstrues the trial court's opinion from the bench. The trial court did not find that Andrea was excluded under MCL 700.2801(2)(d), an issue that was not raised in the original petition. Rather, the trial court incidentally noted that Andrea was involved in another romantic relationship at the time of Donald's death, which was a fact that supported its ultimate finding with respect to MCL 700.2801(2)(e)(*i*) and, coincidentally, was consistent with a separate provision, MCL 700.2801(2)(d). Therefore, because the trial court did not find that Andrea was excluded as a surviving spouse under MCL 700.2801(2)(d), we will not address this argument further.

totality of the circumstances, and courts should evaluate whether complete physical and emotional absence existed, resulting in an end to the marriage for practical purposes." *Id*. at 27. "The burden is on the party challenging a legal spouse's status to show that the spouse was in fact 'willfully absent' for the year or more leading up to the decedent's death." *Id*. at 17.

> To summarize, in order to establish that a decedent's spouse is not entitled to the benefits of a "surviving spouse" under MCL 700.2801(2)(e)(*i*), the challenging party must show, under the totality of the circumstances: (1) that the surviving spouse was completely absent from the decedent spouse, (2) that this absence persisted for a continuous period of at least one year before the decedent's death, and (3) that the surviving spouse acted with a specific intent to be absent from the decedent spouse. [*Von Greiff*, 509 Mich at 304.]

In *Von Greiff*, the decedent-husband died on June 17, 2018, while in the process of getting divorced from his wife. *Id*. at 299. The underlying facts were that the husband and the wife had an aggressive argument on May 16, 2017, and the wife moved out of the marital home two days later. *Id*. The wife did not see or have any direct contact with the husband after May 18, 2017, and on June 1, 2017, she filed for divorce. *Id*. The trial court found that she was "willfully absent" for the purposes of MCL 700.2801(2)(e)(*i*) and therefore not a "surviving spouse." *Id*. at 301. This Court reversed, holding that "as a matter of law, any period of time consumed by a divorce proceeding did not constitute 'willful absence' that would disinherit an otherwise qualified surviving spouse." *Id*.

Our Supreme Court affirmed this Court on different grounds, reasoning as follows. First, the Court explained, "the phrase 'willfully absent from the decedent spouse' does not encompass a categorical rule that precludes a divorcing spouse from losing the benefits of a 'surviving spouse.' It is possible that a divorcing spouse could act with the intention of being completely and continuously absent for the year preceding the decedent's death." *Id*. at 305. However, the Court explained, under *Erwin*, "[a] person is not 'exhibiting inattentiveness toward another' if they are communicating with a spouse indirectly, such as through their attorneys. In this case, it is clear from the record that [the wife and husband] were in contact with each other through their attorneys while litigating the divorce action." *Id*. at 308 (citation omitted). The Court continued:

> [W]e hold that a spouse is only "absent" if they interact with their spouse in a manner that is inconsistent with the very existence of a legal marriage. When one spouse unilaterally and without any consideration of the other spouse's desires cuts off all direct or indirect contact with their spouse for over a year, they have taken action inconsistent with the very existence of a legal marriage. However, when there are communications between the spouses, whether directly or indirectly, the trial court must assess the totality of the circumstances to determine whether these communications are consistent with a recognition that the legal marriage still exists.

> Generally, when a spouse is "emotionally absent" from the decedent spouse as contemplated by *Erwin*, they have taken action inconsistent with the very existence of a legal marriage. But a divorce action is different. By its nature, filing a complaint for divorce tends to recognize the existence of a legal marriage—if the marriage did not exist, why would one need to seek a divorce? Thus, in the context

-8-

of a divorce action, a court should presume that the surviving spouse was not willfully absent. Divorce is a final act that is legally and practically understood to mean that the parties are married until the final act is completed. Divorce actions can easily last more than one year, especially when the marriage is lengthy, there are children involved, or the parties' assets are complex. It is also common, and sometimes necessary, for divorcing spouses to live separately and cease all direct contact while a divorce is pending. This reality supports a holding that filing for divorce creates a rebuttable presumption that one is not willfully absent.

However, it is possible, under rare circumstances, that a challenging party could show that the spouse who filed for divorce nevertheless did not behave in a manner consistent with a recognition of the continued existence of the legal marriage for a year prior to the spouse's death. . . . [*Id*. at 309-311 (cleaned up).]

## B. HEARSAY

Andrea first argues that the trial court relied on inadmissible hearsay. Specifically, Andrea asserts that the trial court erred by allowing Deanna to testify that Donald said that Andrea had stolen money from her. Andrea also asserts that the trial court erred by allowing Victoria to testify that Donald said that the parties had agreed to only keep what they had in their respective possession at the time of the divorce and to not seek assets owned by the other party. Andrea further asserts that the trial court erred by allowing Reynolds to testify that Donald "told me he paid all the bills, all the bills came from his account." Andrea states that these instances of hearsay testimony were inadmissible under MRE 803(3), and the error was not harmless because "the impact of this hearsay testimony was to present [her] as having stolen money from the decedent, not paying anything toward marital bills, and having made an agreement to not seek anything from his estate."[7]

MRE 803(3) provides as follows:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

\* \* \*

(3) **Then-Existing Mental, Emotional, or Physical Condition**. A statement of the declarant's then-existing state of mind or emotional, sensory, or physical condition (such as intent, plan, motive, design, mental feeling, pain, or

---

[7] The trial court also suggested that the hearsay testimony was admissible under MRE 804(a)(4), which provides that a declarant is "unavailable" when he or she "cannot be present or testify at the trial or hearing because of death or a then-existing infirmity, physical illness, or mental illness." However, MRE 804(a)(4) is not itself a hearsay exception. Rather, MRE 804(b) lists specific instances in which hearsay testimony regarding an unavailable declarant is admissible, such as prior deposition testimony. See MRE 804(b)(2). Thus, to the extent that the trial court intended to rely upon MRE 804(a)(4) as an independent hearsay exception, it erred.

bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity, or terms of declarant's will.

"The exclusion of 'statements of memory or belief to prove the fact remembered or believed' is necessary to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of the happening of the event which produced the state of mind." *People v Moorer*, 262 Mich App 64, 73-74; 683 NW2d 736 (2004) (some quotation marks and citation omitted).

In this case, we are inclined to agree with Andrea that the trial court erred by admitting at least two of the hearsay statements at issue. Deanna's testimony that Donald said that Andrea had stolen money from him does not reflect his "then-existing state of mind or emotional, sensory, or physical condition." See MRE 803(3). Rather, it is testimony "to prove the fact . . . believed," which is prohibited by the rule. See *id*. Similarly, Reynolds's testimony that Donald "told me he paid all the bills, all the bills came from his account" does not concern Donald's statement of mind or condition but, instead, is testimony to prove the happening of the underlying event. See *Moorer*, 262 Mich App at 73-74. Further, Victoria's testimony that Donald said that the parties had agreed to only keep what they had in their respective possession at the time of the divorce and to not seek assets owned by the other party might have been admissible as a "plan" under MRE 803(3) to the extent that the statement concerned Donald's own understanding, but to the extent that the statement concerned Andrea's understanding, it arguably was inadmissible as testimony to prove the happening of the underlying event.

Nonetheless, even if the trial court erred by admitting the challenged hearsay statements, any error was harmless. See MCR 2.613(A) ("An error in the admission or the exclusion of evidence . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."). Regarding Deanna's testimony, the trial court did not reference any alleged theft by Andrea from Donald's bank account in its opinion from the bench. Thus, we have no basis for concluding that this allegation was relevant to the trial court's reasoning or ultimate ruling. Regarding Reynolds's testimony, Andrea herself acknowledged while testifying that she stopped assisting with Donald's bills in April 2021. The trial court, in its opinion from the bench, stated that "[i]n April of 2021 she did the absenting. . . . At that point she stopped contributing to any debts and assets accumulated during the marriage including joint debts such as a travel trailer and paid only her own bills." Thus, to the extent that the trial court relied upon Andrea's alleged failure to pay bills, it only did so by reference to April 2021, which was supported by Andrea's own testimony. Finally, with regard to Victoria's testimony, the trial court stated in its opinion from the bench that her testimony "is consistent with the statement in the decedent's will that the parties indicated that they would make no claims against each other." Indeed, the will provides that "**ANDREA L. ELLS** is my spouse; however, we have been separated for many years and have agreed to make no claims on the estate of the other." There is nothing to suggest that this statement in the will is an inaccurate reflection of Donald's understanding at the time. Consequently, to the extent that the trial court arguably erred by admitting Victoria's testimony at issue, any error was harmless because the substance of her testimony was well-supported by the will itself, as the trial court correctly observed.

-10-

For these reasons, even if the trial court erred by admitting the challenged hearsay testimony, any error was harmless.

## C. *VON GREIFF*

Andrea next argues that the trial court misapplied *Von Greiff* when it concluded that she was not a "surviving spouse" under MCL 700.2801(2)(e)(*i*). Andrea reasons that the trial court considered the relevant lookback period to be from April 2021 to August 2022, notwithstanding that MCL 700.2801(2)(e)(*i*) and *Von Greiff* contemplate a one-year lookback period from the decedent's death, i.e., from December 2022 to December 2023. Andrea observes that divorce proceedings had been initiated in August 2022, so the entire lookback period in this case was encompassed by divorce proceedings, as in *Von Greiff* itself. Thus, Andrea asserts, this case falls within the *Von Greiff* statement that "[i]t is . . . common, and sometimes necessary, for divorcing spouses to live separately and cease all direct contact while a divorce is pending." *Von Greiff*, 509 Mich at 310. Andrea therefore concludes that defendants failed to rebut the presumption that she was not willfully absent between December 2022 and December 2023. See *id*. at 311.

Preliminarily, we do not understand the trial court as applying a lookback period from April 2021, when Andrea permanently moved out of Donald's home, to August 2022, when the divorce proceedings were initiated. Rather, the trial court reasoned that because Andrea and Donald had essentially ceased contact between April 2021 and August 2022 under circumstances that ordinarily would satisfy MCL 700.2801(2)(e)(*i*), the fact that divorce proceedings were initiated in August 2022 did not revive the relationship for the purposes of that statutory provision. Indeed, as the trial court correctly observed when discussing *Von Greiff*, "[r]elevant to the one year period of absence the Michigan Supreme Court stated that the surviving spouse must act with an intent to be away from his or her spouse for a continuous period of a year immediately proceeding the decedent's spouse death." See also *id*. at 304. Thus, we assume that the trial court correctly understood that the relevant lookback period at issue in this case is from December 2022 to December 2023.[8]

More importantly, we agree with the reasoning and ultimate ruling of the trial court. It is undisputed that in April 2021, Andrea moved to her own condominium unit with her personal belongings and ceased contributing to Donald's bills or other debts accumulated during the marriage. This suggests complete physical absence. Moreover, the record indicates that Andrea and Donald had minimal and insignificant contact after April 2021. While Andrea briefly testified to having "continual divorce talks" during some unspecified time period after April 2021, those "talks" could not have been substantial, as Andrea and Donald apparently had a fundamental

---

[8] We acknowledge that Andrea's understanding of the trial court's opinion from the bench is reasonable. Immediately after recognizing the *Von Greiff* holding that the relevant lookback period is one year immediately preceding the decedent's death, the trial court stated that "it's significant to note that a plain reading of the statute doesn't impose a requirement that the year must be leading up to the decedent's death." When considered in context, however, this statement is better understood as suggesting that *Von Greiff* imposed a limitation on the statute that is not found in the statutory language itself. We do not believe that the trial court affirmatively misunderstood or applied the incorrect lookback period.

misunderstanding or failure to communicate regarding disposal of his property following his death. This suggests, for all practical purposes, complete emotional absence as well. Overall, these circumstances may be fairly characterized as "exhibiting inattentiveness toward another," see *Erwin*, 503 Mich at 10, and acting "in a manner that is inconsistent with the very existence of a legal marriage," see *Von Greiff*, 509 Mich at 309.

Simply put, the timeline of this case removes it from the scope of *Von Greiff*. Fundamentally, *Von Greiff* held that "filing for divorce creates a rebuttable presumption that one is not willfully absent" because "filing a complaint for divorce tends to recognize the existence of a legal marriage—if the marriage did not exist, why would one need to seek a divorce?" *Von Greiff*, 509 Mich at 310. Thus, the period of absence at issue in *Von Greiff* overlapped almost entirely with the divorce proceedings themselves. See *id*. at 299. In this case, in contrast, the parties were willfully absent from each other from April 2021 to August 2022 without even filing for divorce. That is, the parties did not even recognize the existence of a legal marriage by filing for divorce during that substantial 16-month time period. Accordingly, we agree with the trial court's implicit reasoning that because Andrea was willfully absent from Donald from April 2021 to August 2022, the August 2022 initiation of divorce proceedings did not revive or renew the marital relationship for the purposes of MCL 700.2801(2)(e)(*i*).

For these reasons, we conclude that defendants rebutted the presumption that Andrea was not "willfully absent" from Donald between December 2022 and December 2023 notwithstanding that divorce proceedings were ongoing during that time. To the contrary, the totality of the circumstances shows that Andrea was completely absent from Donald for a continuous period of at least one year before his death, with the specific intent to be absent. See *Von Greiff*, 509 Mich at 304. Therefore, we affirm the trial court's ruling that she was not a "surviving spouse" under MCL 700.2801(2)(e)(*i*).

## IV. CONCLUSION

There were no errors warranting relief. Consequently, we affirm.

/s/ Randy J. Wallace
/s/ Michael J. Riordan
/s/ James Robert Redford

-12-